**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FREMICHAEL GHEBREYESUS**, individually and as Trustee of the Estate of Ghebreyesus Ghebrelul Fremichael, <br><br>and<br><br>**SIMRET ZERAI YOHANNES**,<br><br>Plaintiffs,<br><br>v.<br><br>**FEDERAL DEMOCRATIC REPUBLIC OF ETHIOPIA**, *et al.*,<br><br>Defendants. | Case No. 21-cv-02865 (CRC) |

**MEMORANDUM OPINION**

This case pits the former owners of a business in Ethiopia against the current owner and the Ethiopian government. Plaintiffs claim that the current owner, who resides in Nevada, conspired with various Ethiopian officials to engineer a taking of their rightful property. But plaintiffs allege scant facts connecting this purported conspiracy to Washington, D.C. They have thus failed to establish this Court's personal jurisdiction over the individual defendant. And because proceeding against the Ethiopian government defendants alone would be an inefficient use of judicial resources, the Court will exercise its discretion to transfer the case to the District of Nevada.

**I.   Background**

The following background is drawn from the plaintiffs' complaint unless otherwise noted. The Court must take the facts alleged in the complaint as true for purposes of this motion. The defendants no doubt contest many of the allegations.

A long history of hostility between Ethiopians and Eritreans provides the backdrop for this case. That history includes a bloody war in the late 1990s, after Eritrea gained independence from Ethiopia. During the war, Ethiopia reportedly expelled tens-of-thousands of ethnic Eritreans living in the country; Eritrea reportedly reciprocated with its residents of Ethiopian descent. See generally Human Rights Watch, Eritrea & Ethiopia, Vol 15, No. 3 (A), The Horn of Africa War: Mass Expulsions and the Nationality Issue (Jan. 2003), https://www.hrw.org/report/2003/01/29/horn-africa-war/mass-expulsions-and-nationality-issue. Ghebreyesus Ghebrelul,[1] now deceased, was an Ethiopian of Eritrean ethnicity. Compl. ¶ 2. He and his wife, Simret Zerai Yohannes, used to live in Bole, a suburb of Ethiopia's capital, Addis Ababa. Id. They started a company together called Biselex Ethiopia PLC, which bought and sold water and power equipment. Id. Ghebrelul owned two-thirds of Biselex; Yohannes owned the remaining third. Id. ¶ 25. Their son, plaintiff Fremichael Ghebreyesus, also worked for the company. Id. Together, the family expanded Biselex from its "central location" in Ethiopia to Eritrea, Kenya, and the United Kingdom. Id. But when the Ethiopian-Eritrean armed conflict erupted in 1998, Ghebrelul and Yohannes became the targets of "Ethiopia's systematic persecution" and were forced to flee to their secondary residences in Eritrea and Kenya. See id. ¶¶ 27–30.

In their absence, Ghebrelul and Yohannes entrusted Brook Bekele, a Biselex executive of Ethiopian descent, to look after their property. Compl. ¶ 32. Bekele later warned the couple that, if they did not legally transfer Biselex to him (as he was non-Eritrean), "Biselex would cease to exist as a going concern." Id. ¶ 31. Ghebrelul and Yohannes thus entered an indemnity

---

[1] Due to overlap in their names, and following the plaintiffs' lead, the Court will refer to Ghebreyesus Ghebrelul as "Ghebrelul" and plaintiff Fremichael Ghebreyesus as "Ghebreyesus."

contract with Bekele, giving him full ownership in Biselex, in trust, until "circumstances allow[ed]" for the couple to return. See Pls. Ex. 1, Indemnity Contract ¶ 4.6; Compl. ¶¶ 32–33. The contract required Bekele, among other things, to "transfer the net earnings of the company" to Ghebrelul and Yohannes "at the end of every financial year." Indemnity Contract ¶ 4.5. It also required Bekele to maintain the couple's properties in Ethiopia, id. ¶ 4.7, including the home in Bole. Compl. ¶ 40.

Eventually, the Ethiopian-Eritrean conflict cooled, and in 2012, Ghebrelul and Yohannes sought the return of their company. But Bekele refused to relinquish control over Biselex. See Compl. ¶¶ 46–47. He insisted that Ghebrelul had been "removed as a shareholder and CEO" of the company and rejected Ghebrelul's request to step down. Id.; Pls. Ex. 2 (Translated Letter).

Bekele's recalcitrance triggered years of litigation. Ghebrelul first turned to the Committee of Eritreans' Property Reallocation ("CEPR"), a then newly-formed entity tasked with determining the Ethiopian property rights of residents of Eritrean ethnicity. Compl. ¶¶ 5, 48. The CEPR recognized Ghebrelul's ownership of both Biselex and the family home, and he and Yohannes regained possession of both sometime in 2013. Id. ¶¶ 49–51. But that did not last long. Later in 2013, Bekele initiated his own lawsuit in the Ethiopian courts attempting to wrest control back to himself. See id. ¶¶ 52–54. An Ethiopian court determined that the CEPR had acted beyond its authority, and transferred Biselex back to Bekele. Id. ¶ 55. (The home apparently was not included in that ruling.) This process, the complaint alleges, was tainted by kickbacks paid by Bekele to Ethiopian officials. Id. ¶ 56. After losing their company yet again, Ghebrelul and Yohannes countered with an action seeking to enforce the indemnity contract in a different Ethiopian court. Id. ¶ 58. Although that court upheld the contract, it did not fully

restore the couple's ownership interests. Id. ¶ 60. The Ethiopian Supreme Court affirmed that decision in September 2020. Id. ¶ 74.

Meanwhile, in September 2018, Ghebrelul sustained serious injuries from an attack while in Addis Ababa to litigate his case. See Compl. ¶ 59; Pls. Ex. 6 (Letter of Wishes). The complaint suggests the attack was "carried out by agents-for-hire retained" by Bekele. Compl. ¶ 59. The following month, Ghebrelul penned a "letter of wishes" stating that he wanted his son, Ghebreyesus, to "take[] all and complete possession" of the home in Bole and Biselex, thus (arguably) granting Ghebreyesus his two-thirds ownership interest in the company. See Pls. Ex. 6 (Letter of Wishes). Ghebreyesus had become an American citizen in 2001, and now lives in Minnesota. Compl. ¶¶ 10, 59.

As for the home, the complaint alleges that Bekele first tried to regain ownership via yet another lawsuit and, when that failed, he turned to extra-judicial means. Compl. ¶ 63. While Bekele was in the United States, he purportedly bribed certain Ethiopian government officials, who, in return, executed a taking of Ghebrelul's and Yohannes's properties. See id. ¶¶ 64–72. Bekele paid these bribes, the complaint asserts, from bank accounts in the U.S. Id. ¶ 64.

Just over a year after the Ethiopian litigation concluded, the plaintiffs filed this lawsuit. Ghebrelul has since passed away, but wife (Yohannes) and his son (Ghebreyesus, individually and as trustee of his father's estate) remain as plaintiffs. They bring civil RICO, RICO conspiracy, and breach of contract claims against Bekele. They also sue various Ethiopian government defendants, also under the RICO statute, asserting jurisdiction via the Foreign Sovereign Immunities Act.

Both Bekele and the Ethiopian government defendants have moved to dismiss on both jurisdictional and merits grounds. As will be explained, the Court finds that it does not have

personal jurisdiction over Bekele and, as a result, will transfer the case to the District of Nevada, which apparently does. The Court will therefore address only that issue and will not reach any of the defendants' other arguments for dismissal.

## II. Legal Standards

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of "establishing a factual basis for the exercise of personal jurisdiction over the defendant." Crane v. N.Y. Zoological Soc'y, 894 F.2d 454, 456 (D.C. Cir. 1990). A plaintiff "must allege specific acts connecting the defendants with the forum." Second Amend. Found. v. U.S. Conf. of Mayors, 274 F.3d 521, 524 (D.C. Cir. 2001) (citation omitted). Conclusory allegations are not enough to make this showing. See Fawzi v. Al Jazeera Media Network, 273 F. Supp. 3d 182, 185–86 (D.D.C. 2017) (Cooper, J.). Moreover, the Court is not limited to the complaint and "may receive and weigh affidavits and other relevant matter to assist in determining jurisdictional facts." Khatib v. All. Bankshares Corp., 846 F. Supp. 2d 18, 26 (D.D.C. 2012) (citation omitted). While the Court "must resolve factual dispute[] in favor of the plaintiff," it "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts." Livnat v. Palestinian Auth., 851 F.3d 45, 57 (D.C. Cir. 2017) (quoting Helmer v. Doletskaya, 393 F.3d 201, 209 (D.C. Cir. 2004)).

## III. Analysis

### A. Personal Jurisdiction

The constitutional requirement of due process limits a district court's power to exercise jurisdiction over a defendant. See Livnat, 851 F.3d at 54–56 (holding that the same standards for personal jurisdiction apply, whether the analysis is under the Fifth or Fourteenth Amendment). There are two kinds of personal jurisdiction: general and specific. See id. at 56. General (or

5

"all-purpose") jurisdiction "permits a court to 'hear any and all claims against' the defendant." Urquhart-Bradley v. Mobley, 964 F.3d 36, 43 (D.C. Cir. 2020) (citation omitted). The paradigmatic place where an individual is subject to general personal jurisdiction is his domicile, that is, where he lives. See Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924 (2011). There is no basis for the Court to exercise general personal jurisdiction over Bekele here. Per the complaint, he resides in Nevada. Compl. ¶ 17.

This case instead implicates specific (or "case-linked") personal jurisdiction, which "covers defendants less intimately connected with a [forum], but only as to a narrower class of claims." Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021). "Specific jurisdiction . . . requires 'a relationship among 'the defendant, the forum, and litigation.''" Shatsky v. Palestine Liberation Org., 955 F.3d 1016, 1036 (D.C. Cir. 2020) (citation omitted). "The plaintiff's claims," therefore, "'must arise out of or relate to the defendant's contacts' with the forum." Ford, 141 S. Ct. at 1025 (quoting Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty., 137 S. Ct. 1773, 1780 (2017)).

Plaintiffs have not alleged sufficient facts to show their claims arise out of or relate to any contacts Bekele may have with Washington, D.C. The court therefore cannot exercise personal jurisdiction over Bekele consistent with due process or the D.C. long-arm statute, D.C. Code § 13-423(a)(1)-(5).

As described above, this dispute centers on a contract about an Ethiopian business, negotiated and executed in East Africa, and entered into by individuals variously residing in Ethiopia, Eritrea, and Kenya. The plaintiffs allege that Bekele eventually breached the contract and wrongfully took over the business by paying bribes to Ethiopian officials—a scheme allegedly perpetrated from Bekele's "location in the United States . . . using funds he maintains

in U.S. bank accounts." See Compl. ¶¶ 64, 78, 88. But Bekele's "location in the United States," according to the complaint, is Nevada, id. ¶ 17, and his alleged actions were plainly aimed at Ethiopia. So there is no relationship between Bekele, the District of Columbia, and this litigation.

The plaintiffs seek to avoid this conclusion by arguing that one of Biselex's "major clients" is the United States Agency for International Development ("USAID"), which is headquartered in D.C. See Compl. ¶ 87; Opp'n at 15–16. Because Bekele is the "majority shareholder and General Manager of Biselex," the plaintiffs' theory goes, he is subject to specific personal jurisdiction under D.C.'s long-arm statute based on Biselex's business relationship with USAID. See Opp'n at 16–17. This theory misses the mark.

Any business that Biselex may have with USAID cannot be the basis for specific personal jurisdiction because the plaintiffs' claims do not "arise out of or relate to" that business. See Ford, 141 S. Ct. at 1025 (cleaned up) (quoting Bristol-Myers, 137 S. Ct. at 1780).[2] Again, the complaint targets Bekele's alleged misconduct surrounding the Ethiopian litigation, including paying off and conspiring with Ethiopian officials to retake Biselex and the home in Bole. And that purported scheme was directed at Ethiopia and was allegedly executed, in part, from Bekele's "location in the United States," which the plaintiffs place exclusively in Nevada. See Compl. ¶¶ 17, 64, 78, 88.

The plaintiffs emphasize the indemnity contract's requirement that Bekele annually "transfer the net earnings of [Biselex]" to Ghebrelul and Yohannes, and argue that those earnings included revenues derived from USAID contracts. See Indemnity Contract ¶ 4.5; Opp'n at 15.

---

[2] The parties dispute the nature and extent of Biselex's dealings with USAID. But that dispute is irrelevant unless the claims arise out of those dealings, which they do not.

This bank shot misses the rim, however, because the relevant suit-related conduct—Bekele's alleged failure to transfer Biselex's earnings—happened, if anywhere, in Nevada or Ethiopia. And while the effects of Bekele's alleged withholding of Ghebreyesus's claimed ownership interest in Biselex's net earnings may have been felt in Minnesota where Ghebreyesus resides, they were not felt in D.C. See Calder v. Jones, 465 U.S. 783, 788–89 (1984) (personal jurisdiction exists if the brunt of the defendant's conduct is felt in the forum); Compl. ¶ 10; Pls. Ex. 6 (Letter of Wishes).

The plaintiffs make two last-ditch efforts to establish personal jurisdiction, but each fails for the same reason. First, they contend jurisdiction is permissible based on the RICO statute, which permits additional, non-resident defendants to be brought before the forum court if "venue is appropriate" for at least one defendant and if required by the "ends of justice." 18 U.S.C. Section 1965(b); Kazenercom TOO v. Turan Petroleum, Inc., 590 F. Supp. 2d 153, 160 (D.D.C. 2008). But this jurisdictional hook only works if the plaintiffs "show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators." Oceanic Expl. Co. v. ConocoPhillips, Inc., Civ. A. No. 04-332 (EGS), 2006 WL 2711527, at *12 (D.D.C. Sept. 21, 2006) (quoting Butcher's Union Local No. 498, United Food & Com. Workers v. SDC Inv., Inc., 788 F.2d 535, 539 (9th Cir. 1986)). Here, the courts of Nevada appear to have jurisdiction over Bekele. The plaintiffs allege that he lives there, Compl. ¶ 17, and he consents to jurisdiction there. See Reply at 10 n.3. And to the extent the plaintiffs can establish an exception to foreign sovereign immunity, the District of Nevada would have personal jurisdiction over the Ethiopian government defendants as well. Plaintiffs thus cannot rely on the civil RICO statute to establish personal jurisdiction in D.C.

Second, the plaintiffs point to Federal Rule of Civil Procedure 4(k)(2), which permits courts to exercise personal jurisdiction over defendants in federal law claims if (1) process was properly served; (2) "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction;" and (3) "exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2); Ofisi v. Al Shamal Islamic Bank, No. CV 15-2010 (JDB), 2019 WL 1255096, at *3 (D.D.C. Mar. 19, 2019). As discussed, since Bekele appears subject to personal jurisdiction in Nevada, the requirements of this rule are not met.

### B. Transfer

Acknowledging personal jurisdiction in Nevada, Bekele invites the Court to transfer the case there. "A court may transfer a case to another jurisdiction even though it lacks personal jurisdiction over [a] defendant[]." Novak-Canzeri v. Saud, 864 F. Supp. 203, 207 (D.D.C. 1994); see also Cameron v. Thornburgh, 983 F.2d 253, 257 (D.C. Cir. 1993). Transfer is appropriate under 28 U.S.C. § 1406(a) if the Court finds it is "in the interest of justice" to do so, and if venue would be proper under § 1391. "The decision to transfer an action on this basis is left to the discretion of the court." Sweetgreen, Inc. v. Sweet Leaf, Inc., 882 F. Supp. 2d 1, 6 (D.D.C. 2012).

The Court will transfer this case to the United States District Court for the District of Nevada. That is where Bekele is alleged to have operated his scheme and where he concedes personal jurisdiction. See 28 U.S.C. § 1391(b)(2), (3); Reply at 10 n.3. Transferring the entire case to that court is in the interest of justice because it will avoid piecemeal litigation over related claims, and potential appeals, in two different courts. This approach allows a single court to decide this entire controversy over both sets of defendants. Moreover, the parties spar over whether the claims are time barred. Mot. Dismiss at 37–40; Opp'n at 24–27. Although the

Court will not wade into that dispute, it does not want to risk putting the plaintiffs outside any applicable limitations period by dismissing the suit.

## IV. Conclusion

For these reasons, the Court will grant Bekele's motion to dismiss for lack of personal jurisdiction and transfer this case to the United States District Court for the District of Nevada. The Court will also deny as moot the plaintiffs' motion to strike an affidavit Bekele submitted regarding his jurisdictional ties to D.C. A separate Order accompanies this opinion.

CHRISTOPHER R. COOPER
United States District Judge

Date: September 28, 2022